**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| ARGONAUT MANUFACTURING SERVICES, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; UNITED STATES CUSTOMS AND BORDER PROTECTION; SCOTT BESSENT, *in his official capacity as Secretary of Homeland Security*; UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; UNITED STATES DEPARTMENT OF COMMERCE; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection*; JAMIESON GREER, *in his official capacity as the United States Trade Representative*; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,<br><br>Defendants. | Case No. 1:25-cv-00272<br><br>**COMPLAINT** |

Plaintiff Argonaut Manufacturing Services, Inc. ("Plaintiff" or "Argonaut"), by and through its undersigned counsel, bring this civil action against Defendants and alleges as follows:

**INTRODUCTION**

1. Plaintiff Argonaut commences this action to obtain relief in the form of a refund of import duties imposed by certain Executive Orders and paid by Plaintiff, should those tariffs be determined to be unauthorized.

2.	Legal challenges to tariffs on goods originating from a range of countries, including the European Union ("EU"), are currently pending before the Supreme Court of the United States. *See Learning Resources, Inc. v. Trump*, *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025); *Trump v. V.O.S. Selections, Inc.*, *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025). Lower courts have determined that these tariffs, imposed pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, were not authorized. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025); *Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025). However, the scope of available and appropriate relief in those challenges is in dispute. Indeed, while the Federal Circuit ruled on the merits that the tariffs are not authorized, it remanded the question of the appropriate injunctive relief to the Court of International Trade. *See V.O.S. Selections*, 149 F.4th at 1339-40. This raises the possibility that, even if the pending legal challenges result in findings that the tariffs were not authorized, the decisions may not directly order a refund of duties paid by Plaintiff Argonaut.

3.	Accordingly, Argonaut brings this action to ensure that, in the event these tariffs are found to be unauthorized, it can obtain a judgment ordering the refund of duties that Argonaut paid and further ordering that these tariffs not be collected on any future Argonaut imports.

## JURISDICTION

4.	The Court has subject matter jurisdiction under 28 U.S.C. § 1581 because this action is commenced against an officer of the United States and arises out of an Executive Order providing for tariffs. 28 U.S.C. § 1581(i)(1)(B); *see Solfa Solar, Inc. v. United States*, 296 F. Supp. 3d 1296, 1299 (Ct. Int'l Trade 2018); *V.O.S. Selections, Inc.*, 149 F.4th at 1328-30.

5. The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action. 28 U.S.C. §§ 2643(a)(1), (c)(1).

## PARTIES

6. Plaintiff Argonaut Manufacturing Services, Inc. is a contract manufacturer based in California, providing complex manufacturing services for the pharmaceutical, life sciences, and diagnostic industries. Argonaut has made and makes significant direct purchases of complex manufacturing equipment from the EU. The goods it imports are not reasonably available from a manufacturer in the United States.

7. Defendant the United States of America is the federal government of the United States of America.

8. Defendant Kristi Noem, in her official capacity, is the Secretary of Homeland Security. She is responsible for implementing Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (April 2, 2025) (as amended, the "Challenged Order"), which relied on IEEPA to impose tariffs on U.S. trading partners around the world, including the EU. She is also responsible, through the Department of Homeland Security's component, United States Customs and Border Protection, for administering and collecting tariffs directed by the Challenged Order

9. Defendant United States Customs and Border Protection is responsible for administering and collecting tariffs directed by the Challenged Order.

10. Defendant Scott Bessent, in his official capacity, is the Secretary of the Treasury. He is responsible for consulting on implementation of tariffs directed by the Challenged Order.

11. Defendant United States Department of the Treasury is responsible for consulting on implementation of tariffs directed by the Challenged Order.

12. Defendant United States Department of Homeland Security is responsible for implementing the Challenged Order. It is also responsible, through its component, United States Customs and Border Protection, for administering and collecting tariffs directed by all the Challenged Order.

13. Defendant Howard Lutnick, in his official capacity, is the Secretary of Commerce. He is responsible for implementing tariffs directed by the Challenged Order.

14. Defendant United States Department of Commerce is responsible for implementing tariffs directed by the Challenged Order.

15. Defendant Rodney S. Scott, in his official capacity, is the Commissioner of Customs and Border Protection. He is responsible for administering and collecting tariffs directed by the Challenged Order.

16. Defendant Jamieson Greer, in his official capacity, is the United States Trade Representative. He is responsible for implementing tariffs directed by the Challenged Order.

17. Defendant the Office of the United States Trade Representative ("USTR") is responsible for implementing tariffs directed by the Challenged Order.

## STANDING

18. To establish Article III standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Plaintiff is harmed by the Challenged Order because Plaintiff has imported and continues to import goods subject to tariffs imposed by the Challenged Order and, therefore, has paid and would be required to continue paying

these tariffs to the U.S. government. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury").  An order from this Court requiring refund of the duties paid will redress these injuries by reversing the costs incurred by Plaintiff's business.  Declaratory and injunctive relief will further redress these injuries because Plaintiff will no longer be required to pay the tariffs on future imports.

## BACKGROUND & FACTUAL ALLEGATIONS

### A. The Universal and Reciprocal Tariff IEEPA Order

19.     On April 2, 2025, the President issued an Executive Order imposing tariffs on goods in originating in virtually all countries.  *See* the Challenged Order (previously defined as Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (April 2, 2025), as amended).  The express stated goal of these tariffs is "to rebalance global trade flows." *Id.* at 15,045.

20.     The Challenged Order declares that the "large and persistent annual U.S. goods trade deficits" are a "national emergency" because they "constitute an unusual and extraordinary threat to the national security and economy of the United States." *Id.* at 15,041.

21.     The Challenged Order finds that these trade deficits have "led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.* at 15,041.

22. Based on this newly declared national emergency, the Challenged Order specifically imposes "an additional *ad valorem* duty" of 10 percent "on all imports from all trading partners" except for countries and products as expressly excluded. *Id.* at 15,045. The Order also imposes a country-specific tariff rate on 57 trading partners, including the EU. *Id.* at 15,045, 15,049-50. Taken together, these tariffs are referred to as the "Reciprocal Tariffs." The Challenged Order modifies the Harmonized Tariff Schedule of the United States ("HTSUS") accordingly. *Id.* at 15,047.

23. The 10 percent universal tariffs took effect on April 5, 2025. *Id.* at 15,045, 15,047.

24. The Challenged Order imposes an adjusted *ad valorem* duty of 20 percent on all imports from the EU. *Id.* at 15,049. The Challenged Order modifies the HTSUS accordingly. *Id.* at 15,047.

25. These country-specific tariff rates were calculated not by reference to the rates these countries charge the United States. Rather the tariff rate for a specific country is calculated by dividing the United States's trade deficit with that country by total imports from that country, and then dividing by two.[1]

26. These country-specific tariff rates were set to take effect on April 9, 2025. Order, 90 Fed. Reg. at 15,045.

---

[1] *See* Office of the United States Trade Representative, *Reciprocal Tariff Calculation* (publicly available at https://ustr.gov/sites/default/files/files/Issue_Areas/Presidential%20Tariff%20Action/Reciprocal%20Tariff%20Calculations.pdf) (last accessed October 10, 2025); *see also* BBC, *How were Donald Trump's tariffs calculated?* (publicly available at https://www.bbc.com/news/articles/c93gq72n7y1o) (last accessed October 10, 2025). Indeed, the European Union's weighted average tariff charged to exports from the United States in 2023 was 3.9 percent for agricultural products and 1.0 percent for non-agricultural products, neither even approaching the 20 percent "reciprocal" tariff imposed by the Order. *See* World Trade Organization, *European Union Tariffs and imports: Summary and duty ranges*, publicly available at https://www.wto.org/english/res_e/statis_e/daily_update_e/tariff_profiles/US_e.pdf (last accessed October 10, 2025).

27. On April 9, 2025, the President issued Executive Order No. 14266 suspending imposition of the country-specific rates until July 9, 2025. Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625, at 15626 (April 9, 2025). That order did not suspend the 10 percent universal tariffs, meaning that the 10 percent rate would apply during that period to goods originating in all of the trading partners covered by the Reciprocal Tariffs. *Id.*

28. On April 11, 2025, the President clarified that a variety of technological products related to computers, data processing, telecommunications, and electronic components were exempted from the Reciprocal Tariffs.[2]

29. On July 7, 2025, the President issued Executive Order No. 14316 extending the suspension of the country-specific rates until August 1, 2025. Exec. Order No. 14316, *Extending the Modification of the Reciprocal Tariff Rates*, 90 Fed. Reg. 30823, at 30823 (July 7, 2025).

30. On July 31, 2025, the President issued Executive Order No. 14326, which adjusted the country-specific rates and further extended their application until seven days after the order. Exec. Order No. 14326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37963, at 37963-64 (July 7, 2025). The Reciprocal Tariff rate for the EU was modified to be determined on a good-by-good basis depending on the "Column 1 Duty Rate" applicable to a good under the HTSUS. *Id.* at 37964. If the Column 1 Duty Rate is more than 15 percent, no additional duty will be applied to imports of those goods. *Id.* If the Column 1 Duty Rate is less than 15 percent, the total *ad valorem* duty—that is, the Column 1 Duty Rate plus the Reciprocal Tariff rate—is set to 15 percent for those goods. *Id.*

---

[2] *See* Presidential Memorandum, *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended* (April 11, 2025).

31. The only asserted authority for imposing tariffs under the Challenged Order is IEEPA. No other President has ever imposed tariffs under IEEPA. *See Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209, 219 (D.D.C. 2025).

**B. Plaintiff's Importation Under the Challenged Order**

32. Between July 1 and November 1, 2025, Plaintiff imported goods from the EU.

33. The imported goods are complex machinery produced by specific manufacturers in the EU. There is no substitute for this machinery manufactured in the United States.

34. Those imports were subject to the Reciprocal Tariffs imposed by the Challenged Order.

35. In total, Plaintiff has paid approximately $1,000,000 in tariffs on these imports pursuant to the Challenged Order in excess of what it would have paid absent the tariffs imposed by the Challenged Order.

36. These tariffs have caused Plaintiff's business to suffer as it has faced unexpected costs.

**C. <u>Pending Legal Challenges to the Executive Order</u>**

37. Two cases, now consolidated, are pending before the Supreme Court of the United States challenging the President's authority to issue the Challenged Order (and other tariff-related Executive Orders) under IEEPA and the Constitution. *See Learning Resources, Inc. v. Trump*, *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025); *Trump v. V.O.S. Selections, Inc.*, *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025). Oral argument was held on November 5, 2025.

38. In *Learning Resources*, educational toy companies brought suit in the District Court for the District of Columbia ("<u>D.C.C.</u>") seeking a declaration that various tariff-related Executive

Orders invoking IEEPA to impose tariffs were unlawful and to enjoin the enforcement of several tariff-related Executive Orders, including the Challenged Order. *See Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025). On May 29, 2025, the D.C.C. issued an order (1) declaring that the Executive Orders were unlawful; (2) declaring that the IEEPA did not authorize the President to impose the related tariffs; and (3) preliminarily enjoining the defendants from collecting the related tariffs from the plaintiffs. *See id.* at 233. The D.C.C. order was appealed to the U.S. Court of Appeals for the D.C. Circuit, but the Supreme Court granted *certiorari* before judgment. *See Learning Resources, Inc. v. Trump*, No. 24-1287, 2025 WL 2601021, at *1 (U.S. Sept. 9, 2025).

39. Likewise, in *V.O.S. Selections*, various companies and several states[3] brought suit in the Court of International Trade (the "CIT") seeking a declaration that certain Executive Orders invoking IEEPA to impose tariff, including the Challenged Order, were unlawful and to enjoin the enforcement of the same. *See V.O.S. Selections, Inc. v. U.S.*, 772 F. Supp. 3d 1350 (Ct. Intl. Trade 2025). On May 28, 2025, the CIT issued an order declaring that the Executive Orders were unlawful and issued a universal permanent injunction enjoining the operation of the Executive Orders. *See id.* at 1383-84. The CIT order was appealed to the U.S. Court of Appeals for the Federal Circuit. On August 29, 2025, the Federal Circuit, sitting *en banc*, held that the Executive Orders were unlawful, but vacated the universal injunction and remanded for the CIT to determine the appropriate injunctive relief. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).[4]

---

[3] The plaintiff-states are Oregon, Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Minnesota, Nevada, New Mexico, New York, and Vermont.

[4] The Federal Circuit held that the vacatur of the universal injunction was warranted based on the intervening decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (U.S. June 27, 2025). There the Supreme Court vacated a universal injunction preventing enforcement nationwide of the President's Executive Orders allegedly seeking to limit birthright citizenship. The majority held that the proper question for determining the scope of injunctive relief "is not whether

40. The plaintiffs in *Learning Resources* and *V.O.S. Selections* advance three grounds under which the Executive Orders are unlawful. First, that IEEPA—the President's asserted authority for the Challenged Order—does not encompass the power to tariff at all. Second, that IEEPA does not authorize these specific tariffs because there is no genuine national emergency. And third, that, if it does authorize these tariffs, IEEPA violates the nondelegation doctrine and is unconstitutional.

### i. The President's Limited Authority to Levy Tariffs and IEEPA

41. The Constitution grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 1, 3. "Tariffs are a tax, and the Framers of the Constitution expressly contemplated the exclusive grant of taxing power to the legislative branch[.]" *V.O.S. Selections*, 149 F.4th at 1322. Tariff-related delegations of congressional authority to the President have been either to impose tariffs in defined circumstances under Title 19 of the United States Code or to negotiate trade agreements subject to Congress's approval. In either form, the President's power is necessarily circumscribed by the Constitution and limits enacted by Congress.

42. Absent Congress's authorization, "the President [can] not increase or decrease tariffs, issue commands to the customs service to refuse or delay entry of goods into the country,

---

an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer to complete relief to *the plaintiffs before the court*." *CASA*, 606 U.S. at 852 (emphasis in original). Plaintiff's instant action arises, in part, from the concern that, even if the Challenged Order is declared to be unlawful in *Learning Resources* and/or *V.O.S. Selections*, under *CASA* relief will be afforded to a group that omits Argonaut. Moreover, if the Supreme Court determines that the Reciprocal Tariffs are unlawful, there is no reason for Argonaut to wait for a separate legal issue to be litigated. A refund would be extremely significant for Argonaut's business operations, and there is no reason to defer such a refund to see if another plaintiff's case could remedy Plaintiff Argonaut's harm. The Federal Circuit also determined that the CIT had exclusive jurisdiction over the case. *See V.O.S. Selections*, 149 F.4th at 1328-30.

or impose mandatory import quotas." *Consumers Union of U. S., Inc. v. Kissinger*, 506 F.2d 136, 142-143 (D.C. Cir. 1974).

43. Through IEEPA, Congress granted the President authority to take specified emergency economic measures during a declared emergency.

44. IEEPA became law in 1977. Both the House and Senate committee reports "expressed the view that past Presidents had abused the authority to regulate economic transactions in a national emergency" under a different statute—the Trading With the Enemy Act ("TWEA")—"by using it in circumstances far removed from those that originally gave rise to the declaration of national emergency." Douglas A. Irwin, *Clashing Over Commerce: A History of U.S. Trade Policy*, at 7 n.51 (2017); H. Rep. No. 95-459 (1977); S. Rep. No. 95-466 (1977).

45. Accordingly, IEEPA provides the President with authority to take specified actions "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

46. Specifically, the President may (1) "investigate, regulate, or prohibit" transactions in foreign exchange, certain transfers of credits or payments, and the importing or exporting of certain currencies or securities;" and (2) "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving" property in which a foreign country or national has an interest; and (3) confiscate property of foreign persons, organizations, or countries that have "planned, authorized, aided, or engaged in . . . [armed] hostilities or attacks against the United States." 50 U.S.C. § 1702(a)(1).

47. IEEPA limits when the President may exercise these emergency powers, providing that "[t]he authorities granted to the President . . . may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

### ii. IEEPA Does Not Encompass the Authority to Levy Tariffs.

48. The plain language of the IEEPA does not give the President authority to impose tariffs. IEEPA does not use the words "tariffs" or "duties," their synonyms, or any other similar terms like "customs," "taxes," or "imposts." If Congress had intended to delegate to the President the broad power to levy tariffs under the IEEPA, it would have had to clearly say so. *See Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023) (requiring a clear statement from Congress when the interpretation of a provision would have a "question of 'deep economic and political significance' that is central to [the] statutory scheme") (alteration in original) (quoting *King v. Burwell*, 576 U.S. 473, 486, (2015)).

49. While IEEPA gives the President the power to "regulate . . . [the] importation or exportation" of property, that provision does not encompass the power to tariff. The power to "regulate" is not the power to "tax." *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201, 6 L.Ed. 23 (1824)(Marshall, C.J.) ("[T]he power to regulate commerce is . . . entirely distinct from the right to levy taxes and imposts."). In context, "regulate" is in a list of other verbs including "investigate, block during the pendency of an investigation, . . . direct and compel, nullify, void, prevent or prohibit." 50 U.S.C. § 1702(a)(1)(B). None of these verbs deal with the power to raise revenue or impose taxes. The distinction between regulation and taxation is underscored by the Securities Exchange Act of 1034 which directs the Securities and Exchange Commission ("<u>SEC</u>") to

"regulate the trading of" securities—clearly Congress did not intend to grant the SEC the power to broadly tax trading activity.

50. When Congress has delegated the President the authority to levy duties or tariffs, it has established express procedural, substantive, and temporal limits on that authority. For example, Section 122 of the Trade Act of 1974—enacted just before the IEEPA—authorizes the President to impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payment deficits," but those tariffs are capped at 15 percent and can last only 150 days without Congressional approval. 19 U.S.C. § 2132. For an additional example, Section 301 of the Trade Act of 1974 authorizes an executive officer to impose duties on a foreign country that has been found, after notice and investigation,[5] to have committed unfair trade practices or violated trade agreements with the United States. 19 U.S.C.§ 2411(c). Unlike these examples, IEEPA sets no such restrictions.

51. At bottom, Congress has enacted a comprehensive scheme detailing when and how the President may impose tariffs under other statutes—"It would be anomalous for Congress to have painstakingly described the [President's] limited authority, but to have given him, just by implication," nearly unlimited tariffing authority under IEEPA. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).

52. Historical practice further demonstrates that IEEPA does not encompass the power to levy tariffs. In the five decades since IEEPA's passage, no President has invoked IEEPA or its predecessor, TWEA, to impose tariffs. IEEPA has, instead, been understood to authorize only targeted economic sanctions to address an underlying threat to U.S. national security.

---

[5] Section 301 requires the USTR to initiate an investigation, consult with the foreign country regarding the practices being investigated, determine whether the requisite conditions for action have been met, publish its proposed action and the factual findings on which it is based, and allow for public regarding both the proposed investigation and the final action. *See* 19 U.S.C. §§ 2412, 2413, 2414.

53. The major questions doctrine further confirms that the IEEPA does not grant the authority to levy tariffs. As explained by the Supreme Court, the doctrine applies in "cases in which the history and breadth of the authority asserted" by the government entails "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). In such circumstances, there may be a "reason to hesitate before concluding that Congress meant to confer such authority." *Id.* at 732. These tariffs imposed by the Challenged Order are of indisputable economic and political significance.

### iii. IEEPA Does Not Authorize the Challenged Order.

54. Even if IEEPA permits the imposition of tariffs by the President in certain circumstances, those circumstances were not met here because the Challenged Order (a) does not involve an "unusual or extraordinary threat" to the nation; (b) does not "deal with"—meaning reasonably relate—to the national emergency declared by the President; (c) has been employed to take on numerous, unrelated problems for which no national emergency has been declared in the first place; and/or (d) is otherwise broader or outside the scope of the narrow delegated authority to impose tariffs.

55. The Challenged Order does not concern any "emergency" or "unusual" or "extraordinary" threat. The President's asserted basis for the Challenged Order is "persistent" "annual trade deficits." Challenged Order, 90 Fed. Reg. at 15,041. The U.S. has maintained trade deficits, including with countries in the EU, dating back to before the enactment of IEEPA. Indeed, the U.S. has enjoyed exceptional economic growth in the last 50 years.[6] Moreover, Congress passed a law to address a "large and serious balance-of-payments deficit" in Section 122 of the

---

[6] *See* Andrea Freytag & Phil Levy, *The Trade Balance and Winning at Trade* (Oct. 3, 2024) (publicly available at https://www.cato.org/publications/trade-balance-winning-trade) (last accessed October 10, 2025).

Trade Act of 1974, which unlike the authority asserted here explicitly permits tariffs but limits them to 15 percent and a duration of 150 days absent congressional approval.[7]

56. The tariffs imposed also bear little relation to the purported national emergency. Even if the tariffs could address a trade deficit, the Challenged Order imposes tariffs on a wide swath of countries with different trade profiles vis-à-vis the United States, including some with which the United States runs a trade surplus or that do not charge any tariffs for American goods. Thus, the tariffs are simply not "reasonably related" to any asserted "emergency." *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 577 (C.C.P.A. 1975) (holding that tariffs under the TWEA must be "reasonably related" to the emergency that the President declared).

### iv. Alternatively, IEEPA is an Unconstitutional Delegation.

57. Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

58. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States,* 488 U.S. 361, 371 (1989).

59. Accordingly, any grant of regulatory authority to the executive branch must be accompanied by an "intelligible principle" that will form the basis of executive action. *See A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States,* 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States,* 321 U. S. 414, 426 (1944)).

---

[7] 19 U.S.C. § 2132.

60. Even if IEEPA did grant the President the authority to impose tariffs, it would constitute an unlawful delegation of legislative authority without the requisite intelligible governing principle. Interpreting IEEPA to provide authority for frequent and significant changes to the tariff schedule would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *See Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 646 (1980); *see also Schecter Poultry*, 295 U.S. at 529 (holding that Congress "is not permitted to abdicate or transfer to other the essential legislative functions with which it is . . . vested").

61. If something as longstanding and benign as bilateral trade deficits qualify as an "emergency" and as an "unusual and extraordinary threat," then there is no genuine, intelligible principle in IEEPA upon which to assess the President's adherence to Congress's guidance.

62. The breadth of the tariff-imposition authority asserted under IEEPA—to impose tariffs at any rate on any country for any duration—counsels against reading IEEPA to confer such an extreme delegation of authority let alone one with intelligible guiding principles.

## CLAIMS FOR RELIEF

### COUNT I
### *ULTRA VIRES* ACTS IN VIOLATION OF THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT, 50 U.S.C. § 1702

63. Plaintiff realleges and incorporates herein by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

64. The court has the ability to enjoin unconstitutional acts by state and federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Accordingly, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

65. The Challenged Order is *ultra vires* because, even in the face of an actual national emergency, IEEPA does not authorize the President to impose tariffs.

66. Alternatively, the Challenged Order is *ultra vires* because bilateral trade deficits, do not constitute a genuine "emergency" or an "unusual" or "extraordinary" threat to national security, or the Challenged Order is otherwise broader than the narrow delegation of tariff authority under IEEPA.

67. For these reasons (or for any other reason that the Supreme Court or a binding decision of another court of competent jurisdiction may find), the Court should declare that the Challenged Order (including any future amendments thereto) is *ultra vires* because it exceeds the President's authority under IEEPA, and that the corresponding modifications to the HTSUS are unlawful.

68. Because the Challenged Order is *ultra vires*, and the corresponding modifications to the HTSUS are unlawful, it cannot be enforced by Defendants against Plaintiff. To the extent that the Challenged Order has not already been permanently enjoined by another court as to Plaintiff, this Court should accordingly enjoin Defendants, in their official capacities, from enforcing the Challenged Order (including any future amendments thereto) against Plaintiff.

69. If the Challenged Order is not declared *ultra vires* and the HTSUS modifications are not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable harm.

70. Plaintiff is also entitled to an order directing Defendants to refund the tariffs paid as a result of their imposition by the unlawful Challenged Order, on all relevant entries whether liquidated or unliquidated.

## COUNT II
### VIOLATION OF ARTICLE I, § 1 OF THE U.S. CONSTITUTION

71. Plaintiff realleges and incorporates herein by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

72. To the extent IEEPA could be interpreted to permit the President to impose the tariffs as set forth in the Challenged Order, that grant of authority violates Article I of the Constitution and the nondelegation doctrine.

73. The authority to unilaterally impose and modify tariffs as asserted in the Challenged Order would constitute an unconstitutional delegation of legislative authority to the executive branch, without—at a minimum—the requisite intelligible principle to cabin that authority.

74. For these reasons, to the extent that IEEPA delegates to the President the authority to impose the tariffs set forth in the Challenged Order and to the extent that the Challenged Order has not already been permanently enjoined by another court as to Plaintiff, this Court should declare that IEEPA violates Article I, §1 of the U.S. Constitution and is an unconstitutional delegation of legislative power.

75. Additionally, to the extent that IEEPA unconstitutionally delegates to the President the authority to impose the tariffs set forth in the Challenged Order and to the extent that the Challenged Order has not already been permanently enjoined by another Court as to Plaintiff, this Court should enjoin Defendants, in their official capacities, from enforcing the Challenged Order (including any future amendments thereto) against Plaintiff.

76. If the Challenged Order is not declared unlawful and enjoined, Plaintiff will suffer substantial injury, including irreparable harm.

77. Plaintiff is also entitled to an order directing Defendants to refund the tariffs paid as a result of their imposition by the Challenged Order, on all relevant entries whether liquidated or unliquidated.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Argonaut respectfully request that this Court enter an order and judgment:

    a. enjoining Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to collect any tariffs from Plaintiff announced in the Challenged Order (including any future amendments thereto);

    b. declaring that IEEPA grants the President no statutory authority to unilaterally impose tariffs;

    c. declaring that the Challenged Order is unlawful;

    d. declaring that, if IEEPA grants the President the authority to impose the tariffs in the Challenged Order, it constitutes an unconstitutional delegation of legislative power;

    e. awarding Plaintiff, and ordering Defendants to promptly provide, a refund of the amount of any tariffs collected by Defendants pursuant to the Challenged Order, including pre- and post-judgment interest, on all relevant entries whether liquidated or unliquidated; and

    f. grant any such other relief as this Court may deem just or proper.

Respectfully submitted,

Dated: November 17, 2025

By: */s/ Elyssa Kutner*

**DLA PIPER LLP (US)**

Elyssa Kutner
Brian S. Janovitz
Caleb Roche
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4373
elyssa.kutner@us.dlapiper.com
brian.janovitz@us.dlapiper.com
caleb.roche@us.dlapiper.com

*Attorneys for Plaintiff Argonaut Manufacturing Services, Inc.*